UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO.  3:14-CV-703-DJH-CHL


RUDD EQUIPMENT COMPANY, INC.,                                             Plaintiff,

v.

JOHN DEERE CONSTRUCTION &
FORESTRY COMPANY,                                                        Defendant.

## REPORT AND RECOMMENDATION

Though an arbitration panel will resolve the ultimate dispute, Rudd Equipment Company

sued John Deere Construction and Forestry Company in federal court for interim relief.  Rudd

filed a successful motion to seal this entire case and negotiated an agreed order that the district

judge eventually signed.  But when that agreed order fell apart, John Deere moved to unseal the

case and Rudd moved to hold John Deere in contempt.  Because the balance of interests weighs

heavily in favor of unsealing this case, and because Rudd has not overcome its burden of proving

that John Deere violated a definite and specific court order, the undersigned will recommend that

the Court grant John Deere's motion and deny Rudd's.

### BACKGROUND

This is a business dispute over what could be the end of a long relationship between a

manufacturer and a dealer of construction equipment.  In short, John Deere Construction and

Forestry Company is a manufacturer of Hitachi Construction Equipment; Rudd Equipment

Company, Inc. is a dealer that relies on John Deere-supplied Hitachi products for much of its

business.  For various reasons, John Deere wants to terminate that relationship; Rudd vigorously

denies that John Deere has that authority.  Both agree that an arbitration panel will resolve that

dispute in several months.  But what should happen until the arbitration panel rules?  Rudd

thought that John Deere was imposing unfair and unlawful restrictions while the parties prepared for arbitration, so it filed this lawsuit seeking interim relief on October 21, 2014.

That same day, Rudd moved to seal the entire case.  (Docket No. 4.)  In support, it claimed that it could lose its entire business if word of this dispute leaked to its customers, competitors, and employees.  It attributes much of this claim to its warranty and maintenance services—if the arbitration panel rules against it, Rudd says that it would not be able to fulfill its contractual obligation to perform these services with its future and existing customers.  Rudd claims that this would set off an irreparably harmful chain of events.  With its ability to provide warranty and maintenance services in doubt, Rudd may not be able to sell tens of millions of dollars in Hitachi products it had already purchased from John Deere.  Existing customers might take their business elsewhere; potential customers might not give Rudd a second look.  As a result, many of its 400-plus employees may leave for what they consider more stable jobs.  Some of those who stay could be laid off.  Rudd could lose a great amount of good will.  Its reputation could be irreparably harmed.

On November 5, before John Deere responded, the late Senior District Judge John G. Heyburn II granted Rudd's motion and signed its tendered order (the "Sealing Order").  In its entirety, the Sealing Order that Rudd drafted and Judge Heyburn signed states:

> On the Motion of Plaintiff Rudd Equipment Company, Inc. ("Rudd") for an Order directing the Clerk to seal and otherwise protect from public view the record in this case and all pleadings and documents filed in this matter, and the Court being otherwise sufficiently advised,
>
> IT IS HEREBY ORDERED that Rudd's Motion is GRANTED and the Clerk shall seal the case and protect all filings from public view.
>
> IT IS FURTHER ORDERED that all future pleadings and documents in this matter shall be filed under seal.

(DN 8, PageID # 302.)

2

On December 5, in a teleconference held on the record, Judge Heyburn asked the parties whether the case should remain under seal.  (DN 19, PageID # 852.)  Rudd's counsel replied: "Yes.  The concern is that it will get out to the marketplace and customers will learn about this and we are going to lose our entire business related to the Hitachi equipment." (*Id.*).  John Deere's counsel said nothing.  Over next several months, both parties filed dozens of pleadings, motions, and documents, all under seal.

The litigation progressed.  After voluminous briefing on Rudd's motion for a preliminary injunction, the Court scheduled a hearing before this Magistrate Judge on February 26, 2015.  The parties arrived just before 10:00 a.m., but the hearing never began.  The parties wanted to discuss a settlement.  The undersigned Magistrate Judge mediated.  Thirteen hours later, the parties signed an agreement on interim relief.  They filed it as Agreed Order, and Judge Heyburn signed it a few days later.  (DN 44.)

Unfortunately, that agreement did not last long.  Within a month, John Deere had moved to vacate the Sealing Order (DN 46) and Rudd had moved to hold John Deere in contempt for violating the Agreed Order and the Sealing Order (DN 48).

How did things go so wrong so fast?  It all began with a scheduling issue before the arbitration panel.  Before the Agreed Order, the panel gave the parties two hearing dates—one in November 2015 and another in February 2016.  If the parties agreed on interim relief, the panel would hold the hearing in February.  So when the panel's chairperson (Louis Coffey) learned that the parties had reached an agreement, he e-mailed another panel member (Elizabeth Kidd): "Please ask Counsel to submit the agreements which enable the Evidentiary Hearings to be scheduled in February, 2016; they will be memorialized in an order of the Tribunal."  (DN 48-2, PageID # 1668.)   Kidd forwarded that message to the parties' counsel with her own note:

"Counsel, please see Mr. Coffey's message below. . . . Per Mr. Coffey's request, please provide the agreements which enable the Evidentiary Hearings to be scheduled in February 2016." (*Id.*) John Deere's counsel responded the next day: "Per Mr. Coffey's instruction below, I have attached the parties' Agreed Order dated February 26, 2015." (*Id.* at 1667-68.)  With that message, and without first ascertaining Rudd's position on the matter, he sent the Agreed Order to the arbitration panel.

That was the first basis for Rudd's contempt motion.  Rudd's counsel called and e-mailed panel members, asking that they discard the message as it was "filed under seal with the Court and confidential." (*Id.* at 1667.)  They asked John Deere's counsel to join them in asking the panel not to open the e-mail attachment.  They said the disclosure violated the Sealing Order. And because the caption of the Agreed Order included the phrase "*FILED UNDER SEAL*," they said that the disclosure violated that Order too.  After several (increasingly combative) letters and e-mails back and forth, John Deere declined.  It denied that it violated a court order and also said that the Court had issued the Sealing Order in error.  Rudd, of course, disagreed on both points.

Meanwhile, a second problem arose.  A major sticking point between the parties in reaching the interim relief agreement was the amount of equipment that Rudd could purchase on credit.  When John Deere first notified Rudd that it was terminating the relationship, it also notified it that its credit limit would be drastically reduced in the meantime.  But as John Deere has stressed, the ultimate decision to raise or lower Rudd's credit limit rested with John Deere Financial, *a completely separate entity*.  On March 5, on the heels of the mediation that resulted in the agreed interim relief, John Deere Financial wrote Rudd to request information in order to perform an underwriting analysis to re-evaluate Rudd's credit limit.  (DN 48-2, PageID # 1678.)

In that letter, John Deere Financial quoted the Agreed Order.  (*Id.*).  Rudd concluded that John

Deere had disclosed the Agreed Order to another third party.  It is unclear to the undersigned

whether John Deere actually sent the Agreed Order to John Deere Financial, or rather revealed

the terms of it to John Deere Financial.  In either event, Rudd claims this disclosure as the second

basis for its contempt motion.

     The third basis for Rudd's contempt motion arose from what it calls a breach of the

substantive terms of the Agreed Order.  Section 1(a) of the Agreed Order states:

a.  Rudd's credit is hereby limited at any given time during the pendency of the
Arbitration Proceeding, and Deere shall honor and ensure that John Deere
Financial honors the payment terms . . . as follows:

   (i)    Deere shall use its best efforts to cause Rudd's credit limit to be
$6.4 million by March 26, 2015, *including without limitation
Deere guaranteeing an amount acceptable to John Deere Finance
to obtain such $6.4 million credit limit for Rudd*.  If successful,
Deere shall so advise Rudd thereof in writing by such date and the
credit limit referenced above shall be $6.4 million.

   (ii)   If Deere, having used such best efforts, is unable to cause Rudd's
credit limit to be $6.4 million, the credit limit at any given time
during the Arbitration Proceeding shall be a minimum of $2.2
million. . . .

(DN 44, PageID # 1590-91 (emphasis added).)  Rudd's credit limit is $2.2 million.  John Deere

has not guaranteed anything to John Deere Financial.  It has, however, requested financial

information from Rudd; in a recent e-mail to Rudd, John Deere's counsel wrote: "JDCFC [John

Deere] is poised to guarantee the credit limit increase, contingent upon Rudd providing financial

information satisfactory to JDCFC and that supports Rudd's request for a credit limit increase."

(DN 48-2, PageID # 1692.)  Rudd claims that the Agreed Order requires John Deere to make the

guarantee to John Deere Financial—without contingency.  It also says that its audited financial

information is not yet available.

Two motions before the Court present three separate issues.  The first is John Deere's motion to vacate the Court's sealing order.  (DN 46.)  The second is Rudd's motion for contempt.  (DN 48.)  Rudd's motion raises two issues—whether John Deere should be held in contempt for (1) disclosing the Agreed Order (at least twice) and (2) violating the substantive provisions of the Agreed Order.  The Court will consider each issue in turn.

## I.  JOHN DEERE'S MOTION TO UNSEAL

The first issue is whether this case should remain sealed.  John Deere asserts two reasons to unseal this case: (1) the District Court failed to state findings that justify concealing the record; and (2) Rudd has not overcome the presumptive right of public access to Court records.  After balancing the public's interest against Rudd's interest in having this entire record remain sealed, the undersigned recommends that the case be unsealed.

### A.     The Sealing Order itself does not support a continued seal

Under the First Amendment and the common law, a court that seals a case from public view must state findings or conclusions that justify nondisclosure to the public.  *See Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n*, 710 F.2d 1165, 1176 (6th Cir. 1983) ("Under the First Amendment and the common law, we conclude that the District Court erred by failing to state findings or conclusions which justify nondisclosure to the public.  The order of the District Court sealing the documents in the case is, therefore, vacated.").  In one unpublished table decision, the Sixth Circuit summarily reversed a district court that sealed an entire record several years prior in connection with a post-trial settlement.  *Goodman v. Fuller*, No. 91-6089, 960 F.2d 149 (6th Cir. Apr. 16, 1992) (unpublished).  In a one-paragraph order, the district court had summarily denied a non-party's motion to unseal the case.  In reversing, the Sixth Circuit stated:  "Where there is a challenge to the propriety of such a seal, however, and the district

court, after weighing the conflicting interests, remains of the view that curtailment of the public's right of access to the records of its court system is justified, it is essential for the court to present a reasoned analysis explaining why." *Id.* at *1. It concluded that "[n]ondisclosure cannot be justified solely on the basis of a sweeping order agreed to by the litigants, but otherwise unexplained, sealing the entire record of a concluded case." *Id.*

Here, the Court signed Rudd's three-paragraph tendered order to seal this case. It did not detail any of its findings or conclusions in support. This does not mean, however, that the Court acted without consideration. At oral argument on the motions considered herein, counsel for John Deere suggested that the Court "rubber-stamped" Rudd's tendered Sealing Order. (DN 59, PageID # 1840.) When pressed, however, counsel for John Deere acknowledged that he had no basis for such a charge, agreeing instead that all John Deere can legitimately say on this point is that no analysis is set forth in the Sealing Order. (*Id.* at PageID # 1840-41.) (It is also worth noting that John Deere raised no objection to the Sealing Order until after it was accused of violating it.) For Rudd's part, it tendered the order in question without including within it *why* the case should be sealed. In the Sixth Circuit, unstated findings are insufficient to support a challenged order that seals documents from public view. Accordingly, this case should only remain under seal if the Court makes on-the-record findings that justify a seal.

What of Rudd's contention that the Sealing Order incorporated all of the arguments in its motion to seal the case? It cites *Grove Fresh Distributors, Inc. v. John Labatt Ltd.*, 888 F. Supp. 1427, 1444 (N.D. Ill. 1995), which noted that a district court *should* articulate its findings and reasoning that served as a basis for the decision to seal before concluding, without citation: "But, since an absence of those findings and reasoning in the record is not necessarily evidence that a court never considered good cause, the real question is whether or not there was any substantive

decision behind the record's 'silence.'" *Id.*  Rudd goes on to say that the Sealing Order *mentions* Rudd's motion.  Therefore, Rudd says, the Court must have weighed the proper factors.  But this argument falls short.  *Grove Fresh Distributors* is not the law in the Sixth Circuit[1] —here, a district court's failure "to state findings or conclusions which justify nondisclosure to the public" is reversible error.  *Brown & Williamson*, 710 F.2d at 1176.  As such, the undersigned will review the facts of this case and recommend whether the case should be sealed.

### B.        The relevant factors weigh strongly in favor of unsealing this case

"[E]very court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes."  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978).  Generally, the decision to seal a case is left to the sound discretion of the trial court, "a discretion to be exercised in light of the relevant facts and circumstances of the particular case."  *Krause v. Rhodes*, 671 F.2d 212, 218 (6th Cir. 1982).[2] But having "supervisory power" or "discretion" to seal a case does not imply that a District Court operates without standards.  *Brown & Williamson*, 710 F.2d at 1177.

In determining whether to seal a case from public view, courts must weigh the litigants' privacy interests against the public's right to know.  *See In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 474 (6th Cir. 1983).  This is a balancing test that begins with a strong presumption in

---

[1] Even if *Grove Fresh Distributors* were binding, it is distinguishable.  There, the court reviewed its own sealing and protective orders.  Throughout the opinion, it described many reasons in support of the orders.  *E.g. id.* at 1437-38 ("Vital to the context in which the orders of confidentiality were entered was [the attorney]'s propensity to generate adverse publicity for the defendants by disclosing protected materials in order to get them to settle."); *id.* at 1445 ("Here, of course, the stipulated protective order at issue was submitted to me, I did sign it, and it was entered.  And although I never actually used the phrase 'good cause' to justify my reasons for signing it, the record amply attests to an independent determination of good cause, including a balancing of interests, which justified the seal as well as the protective order."); *id.* ("Given the purpose for the orders, the context in which they were issued, and the balancing of the respective interests, the orders are valid: there was good cause to find good cause.").

[2] In dicta, this opinion notes that "courts have refused to permit their files to serve as . . . sources of business information that might harm a litigant's competitive standing."  *Id.* at 218.  Rudd interprets "competitive standing" to include its plight if the case is unsealed, but the phrase cannot be read so broadly.  First, in support of the statement, the court cited an 1891 decision from the Supreme Court of Michigan and a 1945 decision from the Court of Chancery of New Jersey, *Flexmir, Inc. v. Herman*, 40 A.2d 799, 800 (N.J. Ch. 1945) (finding that trade secrets may be sealed).  Second, the holding in *Brown & Williamson* squarely prohibits such a reading.

favor of openness.  *Brown & Williamson*, 710 F.2d at 1179.  The exceptions fall into two broad categories: "those based on the need to keep order and dignity in the courtroom and those which center on the content of the information to be disclosed to the public."  *Id.*  Content-based exceptions to the right of access include a criminal defendant's right to a fair trial, "certain privacy rights of participants or third parties, trade secrets and national security."  *Id.*

"Simply showing that the information would harm the company's reputation is not sufficient to overcome the strong common law presumption in favor of public access to court proceedings and records."  *Id.*  In fact, "a naked conclusory statement" that public disclosure will injure a party "in the industry and local community falls woefully short of the kind of showing which raises even an arguable issue as to whether it may be kept under seal."  *Id.* at 1180 (quoting *Joy v. North*, 692 F.2d 880, 894 (2d Cir. 1982)).  A party's "natural desire . . . to shield prejudicial information contained in judicial records from competitors and the public . . . cannot be accommodated by courts without seriously undermining the tradition of an open judicial system."  *Id.*  "Indeed, common sense tells us that the greater the motivation a corporation has to shield its operations, the greater the public's need to know."  *Id.*  "In such cases, a court should not seal records unless public access would reveal legitimate trade secrets, a recognized exception to the right of public access to judicial records."  *Id.*

Rudd claims that if the record in this case is made public, it could lose its entire business. It says that unsealing this case would set off a devastating chain reaction.  Existing customers will know that Rudd may not be able to fulfill warranty and maintenance services after John Deere terminates the relationship.  As a result, it says, existing and future customers will take their business elsewhere, employees will leave to find more stable jobs, Rudd will not be able to

sell its current inventory because it will not be able to provide warranty services, and Rudd will

lose good will and suffer severe damage to its reputation.

While Rudd certainly has an interest in keeping this dispute from the public, it is not the

kind of interest that justifies sealing this case.  At the outset, *Brown & Williamson* teaches that

harm to a business's reputation in the industry and in the community cannot justify sealing a

case.  The harm Rudd describes is reputational—Rudd's good will with its employees, its current

customers, and its future customers might suffer.  The other alleged injuries are possible

consequences of that reputational harm—customers and competitors learning about potential

warranty and maintenance difficulties, customers leaving, employees moving, etc.  When Rudd

tries to couch the harm as non-reputational (which it must), it conflates the damage that losing at

arbitration would cause with the harm it would suffer if this case is unsealed.  For example,

whether this case is sealed has little to no bearing on Rudd's ability to provide warranty services

in the future—that is harm that might possibly result if John Deere is able to terminate the

relationship at arbitration.

Rudd cannot identify a recognized exception to the public's right of access.  It has not,

for example, identified a trade secret that could be revealed.  Many of Rudd's proffered reasons

to seal this case actually cut towards public access.  Rudd's current customers, future customers,

and employees are members of the public—they have an interest in knowing about this dispute.

And their interests are strong—so strong that Rudd has argued that if they learn about this

dispute, they might move their business elsewhere or find "more stable" jobs.

The general public's interest in this dispute could also be strong.  Rudd is a prominent

business in Louisville and the surrounding areas that was established over 60 years ago.  It

employs over 400 people.  It has earned a strong reputation in the community and among its

customers.  Now, in light of this dispute, Rudd has repeatedly claimed that it "is in the fight of its

62 year existence, a fight for its life."  (*See, e.g.*, DN 6-3, PageID # 146).  If all of this is true and

Rudd is in danger of "losing its entire business," the public would want to know about it.

If Rudd thinks it will win at arbitration and continue its relationship with John Deere,

then it has the opportunity to explain that to the public.  But federal court is not the place to hide

an unpopular dispute.[3]  The law is clear that reputational harm, however severe, cannot justify a

sweeping order that seals an entire record.  No other valid reasons support continued sealing of

this case.  Rudd has not overcome the strong presumption in favor of public access.

### C.       Rudd's counterarguments are unavailing

Having found that this case should not be *sealed*, the next issue is whether more is

required for it to be *unsealed*.  Rudd claims John Deere waived its right to challenge the Sealing

Order.  Also, Rudd claims that its reliance on the Sealing Order requires John Deere to point to

extraordinary circumstances or a compelling need to unseal the case—a burden it says John

Deere cannot overcome.  Neither argument has merit.

### i.       John Deere did not waive the public's First Amendment rights

"Waiver is the knowing and intentional relinquishment or abandonment of a known

right."  *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs.*, Inc., 481 F.3d

337, 352 (6th Cir. 2007).  "A waiver of First Amendment rights"—like the right of public access

to the courts—"may only be made by a 'clear and compelling' relinquishment of them."  *Nat'l*

*Polymer Prods., Inc. v. Borg-Warner Corp.*, 641 F.2d 418, 423-24 (6th Cir. 1981) (quoting

*Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 145 (1967)).

---

[3] While the arbitration panel could have granted Rudd interim relief, Rudd insisted on a court order that would have the "teeth" of contempt sanctions.  Rudd is availing itself of that benefit:  It thinks John Deere violated substantive provisions of the Agreed Order.  With that, however, comes what it could consider a burden of a federal court action—public access.

Rudd claims that John Deere clearly relinquished its First Amendment rights.  At the beginning of this litigation, John Deere did not object to Rudd's motion to seal the case.  Then, a month later, John Deere again failed to object during a teleconference when the Court asked whether the case should remain sealed.  And for seven months, John Deere has complied with the Sealing Order—it has filed all of its pleadings and motions under seal and entered into the Agreed Order, which explicitly states that it is "*FILED UNDER SEAL.*"

But it is difficult to imagine how John Deere could have waived its First Amendment right to review court records.  After all, as a party to this litigation, it has always had the ability to review the entire record.  It cannot be deemed to have waived a right that it has always enjoyed.

More importantly, John Deere could not have waived the *public's* First Amendment and common law right of access to court filings.  In deciding whether to seal or unseal a case, the court has a responsibility to consider the public interest and cannot delegate that responsibility to the parties.  *Knoxville News-Sentinel*, 723 F.2d at 475-76.  Anyone could have moved to unseal this case—Rudd, John Deere, a nonparty, or the Court itself.  In *Knoxville News-Sentinel*, for example, two newspapers intervened in a lawsuit to seek a writ of mandamus requesting that the district court's order sealing certain documents be vacated.  *Id.* at 470.  And in *Brown & Williamson*, the Court unsealed the case *on its own motion*—after a research group filed a "comprehensive amicus brief" in opposition to the district court's order—where the parties had agreed at the outset to keep certain documents sealed from public view.  710 F.2d at 1176.  Even if John Deere had tried, it could not have waived the First Amendment rights of the public.  Accordingly, waiver is not a valid reason to keep this case sealed.

12

###### ii.        Rudd's reliance is insufficient to justify a continued seal

Generally, the "decision whether to lift or modify an order sealing documents is left to the sound discretion of the district court." *Soddu v. Procter & Gamble Co.*, 531 F. App'x 686, 691 (6th Cir. 2013) (citing *Meyer Goldberg, Inc. v. Fisher Foods Inc.*, 823 F.2d 159, 161 (6th Cir. 1987)). But what standard should guide that discretion here? The parties disagree. John Deere says that when one moves to unseal a court record, the standard is the same as when a party moves to seal in the first instance. By contrast, Rudd claims that because it relied on the Sealing Order, *Knoxville News-Sentinel* requires John Deere to prove "extraordinary circumstances" or "compelling need" to unseal this case.

That case warrants some discussion. *Knoxville News-Sentinel* began as a dispute between a bank and the FDIC. The district court granted the bank's unopposed motion for a protective order that "barred all public access to the court file and ordered the parties to keep confidential any information derived from the court file." *Knoxville News-Sentinel*, 723 F.2d at 472. A week later, the bank shut down. *Id.* The district court dismissed the suit, lifted the protective order, and directed that two exhibits—which contained bank records of nonparty customers—be withdrawn from the court file and shielded from public view. *Id.* Days later, two newspapers petitioned for a writ of mandamus to vacate the district court's order protecting those files. *Id.*

The Sixth Circuit denied the petitions. It first noted that the newspapers could not establish "a set of facts of sufficient immediacy and reality warranting a writ of mandamus" with respect to the district court's initial protective order—except for two exhibits, they had access to the entire file. *Id.* at 473 (quotations omitted). Then, the court weighed the *Brown & Williamson* factors and noted that "trial courts have always been afforded the power to seal their records when interests of privacy outweigh the public's right to know." *Id.* at 474. After reiterating that

"[o]nly the most compelling reasons can justify non-disclosure of judicial records," it found that the district court's order "properly protected the identity and privacy of customers of the bank whose names were included in the two exhibits." *Id.* at 476.  Citing various federal statutes and regulations that protect these records, the Court found that individuals have a strong privacy interest in keeping their bank records confidential.  *Id.*  And so the Court concluded that the non-party customers' interest outweighed that of the public.  *Id.*

Then, the court distinguished *Brown & Williamson*:  "[T]he district court's removal of [the exhibits] was designed not to protect the business reputation of the bank, which no longer existed as a banking entity when the order was issued, but rather to protect the privacy rights of borrowers who dealt with the bank.  Unlike the protected party in *Brown & Williamson*, who sought to deny public access because of the adverse business effect disclosure might cause, the individuals protected by the disclosure order here are third parties who were not responsible for the initiation of the underlying litigation."  *Id.* at 477.  It also noted that while *Brown & Williamson* involved the public's strong interest to know the health effects of tar and nicotine contents in cigarettes, the newspapers pointed to no analogous need for the newspapers to know the names and financial records of the bank's customers.  *Id.* at 477-78.

"Finally," the court said that it "must take account of the bank's initial reliance on the district court's protective order."  *Id.* at 478.  The bank contended that it initiated one of its causes of action "'only after' [it] obtained the protective order needed to safeguard the stability of the bank and privacy interests of its customers," and so it placed significant reliance upon the protective order.  *Id.* at 478.  The court said: "Once placed in this position, only 'extraordinary circumstances' or 'compelling need' warrant the reversal of a protective order."  *Id.* (citing *FDIC v. Ernst & Ernst*, 677 F.2d 230, 232 (2d Cir. 1982)).  And then, it concluded: "The particular

14

facts of this case indicate no extraordinary circumstance or compelling need warranting this court's issuance of a writ of mandamus." *Id.*

What to make of the last bit of analysis in *Knoxville News-Sentinel*?  Rudd reads that paragraph as an independent requirement that exists whenever a party relies on a sealing order irrespective of the public's interests or any constitutional or common law concerns.  In other words, because Rudd says that it relied on the Sealing Order to enter into the Agreed Order, the Court must disregard the balancing test and require John Deere to identify some sort of "extraordinary circumstance" or "compelling need" to unseal this case.

Rudd's application of that opinion is perhaps reasonable, but it is unpersuasive.  To begin, the facts of *Knoxville News-Sentinel* bear little resemblance to those here.  There, the court was asked to unseal only the financial records of bank customers who had nothing to do with the lawsuit.  Here, John Deere asks this Court to unseal a case record that might harm the *reputation of the business* that *initiated this lawsuit*.  Nor is the legal analysis throughout the *Knoxville News-Sentinel* opinion consistent with Rudd's legal argument here.

More generally, Rudd's reading does not make sense in light of the policy behind the balancing test.  It would elevate one party's reliance over the constitutional and common-law right of the public to access court records.  And consider the practical implications of that reading.  At least one of the parties is almost always going to rely on a sealing order to some degree.  Once that happens, must the court disregard the balancing and ignore the public's interest?  Could a reviewing court *ever* perform the balancing test?  Rudd's reading would make it irrelevant whether a district court made the proper findings on the record or even applied the proper standard.  Absent extraordinary circumstances, the initial sealing decision would be irreversible.

A better interpretation of *Knoxville News-Sentinel* would "take account" of a party's reliance and any extraordinary circumstances or compelling need in applying the *Brown & Williamson* balancing test.  Recall that before the *Knoxville News-Sentinel* court applied the reliance rationale in one paragraph at the end of the opinion, it first applied the balancing test, stressed the privacy interests of individual's bank records, and distinguished *Brown & Williamson* by noting that the bank was not just trying to protect its business reputation.  If the constitutional and common law tests were irrelevant, why spend the entire opinion going through them when a one-paragraph order on reliance would have resolved the case?

This approach is consistent with a recent Judge Heyburn opinion.  In *Johnson v. Corrections Corp. of America*, No. 3:12-cv-246-H, 2014 WL 3970115, at *2-3 (W.D. Ky. Aug. 13, 2014), Judge Heyburn granted a nonparty's motion to unseal settlement exhibits and explicitly rejected many of the arguments Rudd now makes.  Citing *Brown & Williamson* and *Knoxville News-Sentinel*, the Court said that "the party seeking to block public inspection carries the burden of showing that some significant, countervailing interest outweighs the public right of access." *Id.*  First, the defendant there argued that "because the Court 'carefully considered and granted' the parties' motion to seal the exhibits, the Court should not now unseal the exhibits." *Id.* at *3.  But Judge Heyburn rejected that argument:  "In granting an unopposed motion to seal documents . . . the Court does not enjoin itself from later revisiting its decision if, as here, a third party comes forward seeking access to the sealed material.  It reserves the authority to vacate a protective order if subsequently challenged and if the parties seeking to preserve confidentiality cannot overcome the presumption in favor of public access." *Id.*  Second, the defendant argued that its reliance on confidentiality of the documents justified a continued seal, but Judge Heyburn rejected that too: "Even litigants' reliance on the confidentiality of certain documents in reaching

16

a court-approved settlement agreement fails to overcome the presumption of public access." *Id.*

("Even assuming, however, that the protective order was a material element of the parties'

agreement, their reliance on the documents' confidentiality does not outweigh the interests in

favor of permitting public inspection.").  And third, the defendant argued that "no compelling

reason justif[ied] unsealing the exhibits," but this was also insufficient to maintain the seal:

> This argument, however, overlooks the strong interest retained by the public in
> having access to judicial records, including the settlement exhibits the parties filed
> with the Court.  Moreover, this argument ignores the weight of authority holding
> that the party seeking to uphold a challenged confidentiality order bears the
> burden of showing that some significant interest outweighs the presumptive right
> of access.

*Id.  See also Gookin v. Altus Capital Partners, Inc.*, No. 05-179-JBC, 2006 WL 782456, at *3

(E.D. Ky. Mar. 23, 2006) ("The court recognizes that the information in the FBI memo is

sensitive.  However, by filing suit in federal court where the memo is relevant to the defense of

the suit, [the plaintiff] significantly reduced his expectation of privacy.").

Any reliance on Rudd's part is insufficient to overcome the public's strong interest in

public access to these court records.  At the outset, Rudd filed its motion to seal on the same day

it filed its complaint and motion for preliminary injunction.  It could not have known that the

Court would grant that motion; and it could not have reasonably thought that a sealing order

would have been effective indefinitely.  Even assuming that Rudd did rely on the Sealing Order

in deciding to proceed with this litigation, this reliance would be insufficient to overcome the

great weight of authority that show Rudd has not overcome the presumption of public access.[4]

In any event, this case presents "extraordinary circumstances."  Though the arbitration

panel had the authority to decide interim relief, Rudd wanted a preliminary injunction from this

---

[4] At oral argument, counsel for Rudd suggested that someone from the Clerk's office advised them that
Judge Heyburn would grant their motion to seal the case.  (DN 59, PageID # 1875.)  But, of course, the Clerk's
office does not offer legal advice.  So even if the Clerk's office made this representation, Rudd's attorneys could not
have reasonably relied on it to believe the case would be sealed and remain under seal forever.

court so that any decision would have the "teeth" of the court's contempt powers.  It took advantage of that benefit by moving to hold John Deere in contempt for alleged violations of the Agreed Order.  But, by bringing this case into federal court, Rudd significantly reduced its privacy expectations.

### D.    Unsealing the case affects remedy, not the underlying contempt

This recommendation does not affect whether John Deere can be held in contempt for its actions while the order was still in place.  *See United States v. United Mine Workers*, 330 U.S. 258, 294 (U.S. 1947) ("Violations of an order are punishable as criminal contempt even though the order is set aside on appeal . . . ."); *Kelley v. Carr*, 691 F.2d 800, 807 n.19 (6th Cir. 1980) ("Even assuming the injunction invalid by reasons urged by appellants, until litigated and determined so by an appellate court, the appellants remain obliged to obey the court order."). Unsealing this case does, however, affect Rudd's remedy—in addition to costs and attorneys' fees, Rudd asked that John Deere retrieve and destroy outstanding copies of the Agreed Order.

### II.    RUDD'S MOTION FOR CONTEMPT

The Court now turns to consider Rudd's motion to hold John Deere in contempt.  In a civil contempt proceeding, the petitioner must prove by clear and convincing evidence that the respondent violated a definite and specific court order requiring it to perform or refrain from performing a particular act with knowledge of the court's order.  *Glover v. Johnson*, 934 F.2d 703, 707 (6th Cir. 1991).  In other words, the Sixth Circuit "requires that the prior order be 'clear and unambiguous' to support a finding of contempt."  *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 550 (6th Cir. 2006); *see also Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996) ("Unbroken lines of authority caution us to read court decrees to mean rather precisely what they say.") (quotations omitted).  Persuasive authority provides that "the party alleged to

have disobeyed the order must be able to ascertain from the four corners of the order what acts are required or forbidden." *In re Parker*, 368 B.R. 86 (B.A.P. 6th Cir. 2007) (quoting C.J.S. Contempt § 14 (2007)). "Ambiguities must be resolved in favor of the party charged with contempt." *Capwill*, 462 F.3d at 551. If the petitioner proves the respondent violated the order, the burden shifts to the respondent to prove that it took all reasonable steps within its power to comply with the order—*not* just that it made at good faith effort at compliance. *Id.* at 708 (citing *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989)).

Rudd argues that John Deere should be held in contempt because it: (1) violated various court orders by revealing the Agreed Order to the arbitration panel and John Deere Financial and (2) violated a provision of the Agreed Order concerning Rudd's credit limit with John Deere Financial. The Court will consider each argument in turn.

**A.      John Deere cannot be held in contempt for its revelation of sealed documents**

John Deere shared the Agreed Order—which was filed under seal—with the arbitration panel and perhaps with John Deere Financial. It says that neither revelation violated a court order. Rudd disagrees, claiming that the disclosures violated: (1) the Court's Sealing Order (DN 8); (2) the Agreed Order (DN 44); and (3) Joint General Order 2011-01. Rudd is wrong.

The Sealing Order contains no specific language prohibiting either party from revealing sealed documents. In its entirety, it provides:

> On the Motion of Plaintiff Rudd Equipment Company, Inc. ("Rudd") for an Order directing the Clerk to seal and otherwise protect from public view the record in this case and all pleadings and documents filed in this matter, and the Court being otherwise sufficiently advised,
> IT IS HEREBY ORDERED that Rudd's Motion is GRANTED and the Clerk shall seal the case and protect all filings from public view.
> IT IS FURTHER ORDERED that all future pleadings and documents in this matter shall be filed under seal.

19

(DN 8, PageID # 302-03.)  After this text, it includes the signatures of Rudd's attorneys—who drafted and tendered the Order—and Judge Heyburn.

The Agreed Order contains the same case caption as every other document that has been filed in this litigation.  It says that it was "*FILED UNDER SEAL*."  (DN 44, PageID # 1603.)

Joint General Order 11-01, which is entitled "IN RE: SEALED DOCUMENTS: AMENDMENT TO JOINT GENERAL ORDER 06-01," begins:

> Effective March 15, 2011, Sections One (1), Eight (8), and Nine (9) of the Amended Electronic Case Filing Administrative Policies and Procedures with regard to sealed and ex parte documents are amended as follows:

U.S. Dist. Ct., W.D. Ky., Joint General Order 11-01.  The Joint General Order it modified (06-01) is entitled "ELECTRONIC CASE FILING ADMINISTRATIVE POLICIES AND PROCEDURES."  The amendment that Rudd cites is nestled under the heading "Sealed Documents."  It states:

> (e) Privacy policy.  Federal rules support compliance with the E-Government Act. *See* Fed. R. Civ. P. 5.2; Fed. R. Crim P. 49.1.  Parties and their attorneys are responsible under the rules for preventing disclosure of certain confidential information in case filings.  **The clerk does not review case filings for compliance or independently redact or seal noncomplying filings.**

*Id.* § 8.1(e) (emphasis in original).

The Sealing Order itself does not definitely and specifically prohibit John Deere from disclosing filings.  It only requires that (1) the Clerk seal and otherwise protect the filings from public view; and (2) the pleadings and documents be filed under seal.  The first half of the Order is directed at the Clerk; the second half describes how parties must file pleadings and documents.  Neither mentions confidentiality or nondisclosure.  If the orders in a contempt proceeding are interpreted to "mean precisely what they say," *Grace*, 72 F.3d at 1241, and "[a]mbiguities [are] resolved in favor of the party charged with contempt," *Capwill*, 462 F.3d at 551, then John Deere

20

cannot be held in contempt for violating this Order.  It properly filed all documents in this case under seal; the Order that Rudd tendered and the Court signed required nothing more.[5]

At least three other jurisdictions have explained the difference between a sealing order, which prevents direct public access to the Court's files, and a protective order, which is a restricts parties from disseminating information.  (DN 50, PageID # 1724-25.)  As one Magistrate Judge in the Eastern District of California explained:

> A sealing order merely protects information in the court files from public perusal.  Unless included within, or accompanied by, a *protective order*, the parties who have possession of copies of the sealed information are free to use it in whatever lawful manner the information can be used.  For example, document X may be filed under seal.  The parties in copy possession of document X may still refer to it, investigate the facts therein, contact the persons referenced, or file the copy in another tribunal—assuming that no other law precludes such.

*United States v. Sekhon*, No. S-06-0058 FCD (GGH), 2007 WL 1752589, at *2 (E.D. Cal. June 15, 2007) (emphasis in original).  The Third Circuit has also explained the distinction.  In *United States v. Wecht*, 484 F.3d 194, 212 (3d Cir. 2012), the court noted that "[t]he sealing order prevented direct public access to the documents while the protective order prohibited defense counsel from disseminating the information to the public."  *See also United States v. Dougherty*, No. 14-3498, 2015 WL 574142, at *1 (3d Cir. Feb. 12, 2015), *petition for cert. filed*, (U.S. June 11, 2015) (No. 14-1452) ("In other cases, we have discussed the difference between sealing orders and protective orders.").  Likewise, in *U.S. Commodity Futures Trading Comm'n v. Banc de Binary, Ltd.*, No 2:13-cv-992-MMD-VCF, 2015 WL 1307258, at *1-2 (D. Nev. Mar. 23, 2015), the court explained that "[t]here are there types of protective orders in federal practice"— protective orders, sealing orders, and umbrella or blanket orders—and each serves a different purpose.  Here, the order was a "sealing order," which (by itself) does not require the parties to

---

[5] Even if Rudd is correct and John Deere violated the spirit or the purpose of the Sealing Order, John Deere should not be held in contempt.  Courts do not hold parties in contempt based on implied obligations.  *See In re LaMarre*, 494 F.2d 753, 758 (6th Cir. 1974).

maintain strict confidentiality.  Because there was no accompanying "protective order," John

Deere did not violate Sealing Order.  Even setting aside the labels, John Deere simply did not

violate any definite and specific terms in the Court's order.  If Rudd wanted confidentiality, it

could have requested it.

Rudd's reliance on *Grove Fresh Distributors, Inc. v. John Labatt Ltd.*, 888 F. Supp. 1427

(N.D. Ill. 1995) does not change this analysis.  Even if *Grove Fresh* applied Sixth Circuit

precedent—which it did not—the case is distinguishable.  There, the district court entered one

order sealing the case and another (much longer) stipulated protective order to "provide

protection of confidential and proprietary information and to facilitate discovery." *Id.* at 1431.  It

noted that "the simultaneous use of a sealing order and a protective order is not unusual.  While

there is a definite overlap between the two types of orders in terms of the prohibition on the

dissemination of content, the two are technically different, although the terms are often used

interchangeably." *Id.* at 1436 n.10 (citation omitted).  Over the course of 35 pages, the opinion

detailed the many errors that the plaintiff's attorney made during the course of the litigation—he

violated a sealing order, a protective order, and specific on-the-record instructions of the court;

he blackmailed opposing counsel and repeatedly violated court orders; he failed to appear at

hearings; he made material misrepresentations to the Court of Appeals and fudged his status as

the plaintiff's attorney of record. *Id.* at 1432-34.  The court ultimately sanctioned him and held

him in contempt for several violations of what it collectively called the "confidentiality

orders"—the sealing order and the protective order. *Id.* at 1445-48.  By contrast, John Deere's

counsel sent the Agreed Order to the arbitration panel (after a panel member requested it) and to

John Deere Financial (which played a vital role in John Deere's performance of the Agreed

Order).  Clearly, John Deere's conduct was not as egregious as the attorney's in *Grove Fresh*.

22

Lastly, the Joint General Orders are irrelevant.  For starters, they are "Electronic Case Filing Administrative Policies and Procedures"—and no one disputes that John Deere complied with all electronic filing policies and procedures.  U.S. Dist. Ct., W.D. Ky., Joint General Order 11-01.  And even if these procedures imposed obligations on the parties beyond electronic filing, which they do not, Section 8.1(e) would be irrelevant.  When the entire three-sentence section is read together, it means that the parties and their attorneys—not the clerk—"are responsible under the rules for preventing disclosure of *certain confidential information in the case filings*."  Id. § 8.1(e) (emphasis added).  It does *not* say that all documents in a sealed case are confidential and should not be disclosed.  Thus, the Joint General Orders do not change the analysis.  John Deere cannot be held in contempt for disclosing the Agreed Order.

## B.      John Deere cannot be held in contempt for failing to increase Rudd's credit

Rudd also claims that John Deere should be held in contempt for violating a substantive provision of the Agreed Order that was critical to the agreement, Section 1(a).  It provides:

a.      Rudd's credit is hereby limited at any given time during the pendency of the Arbitration Proceeding, and Deere shall honor and ensure that John Deere Financial honors the payment terms . . . as follows:

(i)      Deere shall use its best efforts to cause Rudd's credit limit to be $6.4 million by March 26, 2015, including without limitation Deere guaranteeing an amount acceptable to John Deere Financ[ial] to obtain such $6.4 million credit limit for Rudd.  If successful, Deere shall so advise Rudd thereof in writing by such date and the credit limit referenced above shall be $6.4 million.

(ii)      If Deere, having used such best efforts, is unable to cause Rudd's credit limit to be $6.4 million, the credit limit at any given time during the Arbitration Proceeding shall be a minimum of $2.2 million. . . .

(DN 44, PageID # 1590-91 (emphasis added).)  John Deere has not guaranteed an amount acceptable to John Deere Financial to cause it to increase Rudd's credit limit to $6.4 million— Rudd's credit limit is $2.2 million.  John Deere wants substantial financial information from

Rudd that is "satisfactory to" John Deere that "supports Rudd's request for a credit limit increase" before issuing a guarantee;[6] Rudd does not want to (and may not be able to) provide it. This failure to issue a guarantee is the only basis for Rudd's motion; it does not otherwise allege that John Deere failed to use its best efforts to cause John Deere Financial to raise its credit. As the arguments of both parties demonstrate, there are multiple ways to interpret this provision. It is a close call. Under the contempt standard, however, the ultimate issue is whether Rudd can prove by clear and convincing evidence that the provision unambiguously requires John Deere to make a guarantee to John Deere Financial.

### i.        Rudd's position

Rudd calls this a clear violation of the Agreed Order, which says that John Deere "*shall use* its best efforts to cause Rudd's credit limit to be $6.4 million by March 26, 2015, *including without limitation* Deere guaranteeing an amount acceptable to John Deere Financ[ial] to obtain such $6.4 million credit limit for Rudd." (*Id.* (emphasis added).) Rudd says that a plain reading of the provision indicates that the guarantee was not simply an example of how John Deere could use its best efforts. Rather, this *mandatory* language required John Deere to both (1) use its best efforts to raise Rudd's credit limit *and* (2) guarantee an amount acceptable to John Deere to raise Rudd's credit limit. Rudd argues that the "including without limitation" language means that John Deere agreed to make the guarantee *as one step* in the course of using its best efforts to cause John Deere Financial to raise Rudd's credit limit. Other actions that John Deere could take in the course of using its best efforts could include, for example, initiating the process pursuant to which John Deere Financial would raise the credit limit, following up to see that it was done by March 26, and as Rudd puts it, "excersis[ing] the inter-corporate influence Deere actually has

---

[6] As John Deere's counsel wrote in an e-mail to Rudd, "[John Deere] is poised to guarantee the credit limit increase, contingent upon Rudd providing financial information satisfactory to [John Deere] and that supports Rudd's request for a credit limit increase." (DN 48-2, PageID # 1692.)

over Deere Financial."  (DN 57, PageID # 1813-14.)  Rudd says that during the settlement conference, John Deere bargained away any discretion on the matter and any authority to ask for additional information.  According to Rudd, any other reading would change the meaning of "shall" and "including without limitation" in the Agreed Order to "may" and "for example, if John Deere chooses."

### ii.        John Deere's position

By contrast, John Deere argues that the Court should view the provision as a whole, striving to give meaning to each term and avoiding redundancy or surplusage.  *See Fed.-Mogul U.S. Asbestos Pers. Injury Trust v. Cont'l Cas. Co.*, 666 F.3d 384, 290 (6th Cir. 2011).  Here, "the paragraphs at issue are not exactly a model of clarity" but "the Court cannot adopt Rudd's isolated reading of the guarantee language because it would nullify and render superfluous all of the 'best efforts' language surrounding it."  (DN 50, PageID # 1728.)

To John Deere, the critical phrase is "an amount *acceptable to John Deere Financ[ial]* to obtain such $6.4 million credit limit for Rudd."  (DN 44, PageID # 1590-91 (emphasis added).)  If Rudd is correct that John Deere had an unconditional obligation to guarantee *an amount acceptable to John Deere Financial to obtain* Rudd's credit limit increase, then John Deere would necessarily have an unconditional obligation *to obtain* Rudd's credit limit increase.  This is because it would be impossible for John Deere to guarantee an amount acceptable to John Deere Financial unless and until John Deere Financial actually raised Rudd's credit limit.[7]  John Deere says that imposing an unconditional obligation on John Deere to increase Rudd's credit limit is just what the parties intended to avoid when they drafted the Agreed Order.

---

[7] To illustrate, say that John Deere had actually guaranteed the full $6.4 million to John Deere Financial, but John Deere Financial refused to raise Rudd's credit limit.  Under Rudd's interpretation, John Deere's guarantee would be inadequate because it was not "an amount acceptable to John Deere Financial to obtain such $6.4 million credit limit for Rudd."

According to John Deere, the remaining language of Section 1(a) evidences this intent. The first clause in Section 1(a)(i) only requires John Deere to use its "best efforts" to cause Rudd's credit limit to be increased.  "Notably, 'best efforts' do not necessarily mean successful ones." *MW Universal, Inc. v. G5 Capital Partners*, LLC, No. 08-495-KSF, 2012 WL 588743 at *8 (E.D. Ky. Feb. 21, 2012) (dicta).  And the last sentence of Section 1(a)(i) contains the phrase "if successful," also illustrating that the parties did not contemplate an assured credit increase. Additionally, the next paragraph (Section 1(a)(ii)) describes what happens "[i]f Deere, having used such best efforts, is unable to cause Rudd's credit limit to be $6.4 million . . . ."  But Rudd's interpretation would not allow for a scenario where John Deere could ultimately fail to cause Rudd's credit limit to increase despite its best efforts.  According to John Deere, Rudd's interpretation would render much of Section 1(a)(i) and all of Section 1(a)(ii) superfluous. Under Rudd's interpretation, the Agreed Order could have simply read:

> (i)      Deere shall ~~use its best efforts to cause Rudd's credit limit to be $6.4 million by March 26, 2015, including without limitation Deere guarantee~~ing an amount acceptable to John Deere Financ[ial] to obtain such $6.4 million credit limit for Rudd [by March 26, 2015].  ~~If~~[When] successful, Deere shall so advise Rudd thereof in writing by such date and the credit limit referenced above shall be $6.4 million.

> (ii)   ~~If Deere, having used such best efforts, is unable to cause Rudd's credit limit to be $6.4 million, the credit limit at any given time during the Arbitration Proceeding shall be a minimum of $2.2 million. . . .~~

To avoid this outcome, John Deere has to stretch the plain language of the guarantee clause.  It says that in order to harmonize the guarantee clause with the remaining paragraphs, the Court must "construe the guarantee clause as specifying that a guarantee acceptable to John Deere Financial was one way, 'without limitation,' in which Deere could exercise its best efforts to cause the credit limit to be increased."  (DN 50, PageID # 11.)  "This reading," it argues, "gives effect to the guarantee clause, while preserving the parties' intent that Deere's obligations

with respect to Rudd's credit limit increase would be 'best efforts,' not assured results." (*Id.*)  It also recognizes the possibility that "John Deere Financial would agree to Rudd's credit limit increase without any guarantee from Deere, or conversely, where John Deere Financial would not have agreed to Rudd's credit limit increase, even with a guarantee from John Deere." (*Id.*)

### iii.        Conclusion

Neither interpretation is perfect.  Rudd's reading would change the meaning of "best efforts" and render much of the remaining language superfluous.  John Deere's reading changes the meaning of "including without limitation."  But because this is a motion for contempt, and not an action for breach of contract, the Court need not choose which side's flawed reading is the correct one.  Rather, the Court must determine whether Rudd has proven by clear and convincing evidence that (1) Section 1(a) is clear and definite and (2) John Deere violated that provision, all while construing all ambiguities in John Deere's favor.  The provision is at least ambiguous and is far from clear and definite.  Because of that alone, the Court should not hold John Deere in contempt.

Nevertheless, this ruling comports with the spirit of the Agreed Order and the realities of the business relationship between Rudd, John Deere, and John Deere Financial.  At the outset, the language of the Agreed Order makes clear the parties' recognition that John Deere did not have the unilateral authority to raise Rudd's credit limit.  As well, the Agreed Order says that "Deere will continue to treat Rudd as a dealer in accordance with the status quo under the Dealer Agreements and Security Agreement as such status quo existed prior to the October 2, 2014 termination, except" for various conditions including Section 1(a).  (DN 44, PageID # 1590.)  If a dealer wants additional credit, it has to submit financial and business information.  Rudd is a dealer that wants additional credit, so it needs to supply John Deere and John Deere Financial

with some information.  Lastly, the Court was swayed by John Deere's claim at oral argument that John Deere Financial *will not* raise a dealer's credit limit without the requested financial information—no matter how much John Deere offers to guarantee.  (DN 59, PageID # 1891-95.)  Because John Deere Financial could not have raised Rudd's credit limit without this information, John Deere could not have agreed to raise Rudd's credit limit without conditions.

In sum, Rudd has failed to overcome its heavy burden of proving by clear and convincing evidence that John Deere violated a definite and specific provision in the Agreed Order.  The entire basis for Rudd's motion is that John Deere did not make a guarantee to cause John Deere Financial to raise Rudd's credit limit.  But the Agreed Order also required John Deere to use its best efforts—and because "best efforts" does not mean "guaranteed results," the provision is at least ambiguous.  Accordingly, the Court must rule for John Deere.

### C.    Rudd's remaining contempt argument falls short

Rudd's final basis to hold John Deere in contempt is unsupported.  Section 6 of the Agreed Order provides that neither party may use "any provision of the Agreed Order" or even "the existence of th[e] Agreed Order" to prejudice any of Rudd's claims, defenses, rights, damages, or other remedies in the Arbitration."  (DN 44, PageID # 1603.)[8]  Rudd cites this provision before concluding that the disclosure was made "in an attempt to prejudice Rudd."  To support this conclusion, it claims: "Numerous facts confirm this was Deere's intent, including Deere's counsel's assertion after he disclosed the Agreed Order that "***I* think it is appropriate for the [P]anel to be aware of the [Agreed] [O]rder *and its contents.*"  (DN 57, PageID # 1809 (emphasis in original).)  Rudd's logic is flawed.  First, it lists none of the "numerous facts" that supposedly confirm John Deere acted in bad faith to prejudice Rudd—and its use of bold,

---

[8] This provision also weakens Rudd's reliance argument, discussed above in Section I(C)(ii).  If the parties actually relied on the belief that this Agreed Order was sealed and therefore had to be kept confidential, then what is the purpose of this provision?

underlining, and italics does not substitute for evidence.  In fact, nothing in the record suggests that John Deere intended to prejudice Rudd.  The arbitration panel requested a copy of the Agreed Order; John Deere complied.  It is unclear how this prejudices Rudd.  And it certainly says nothing of John Deere's subjective intent.  Rudd's argument falls far short of the high hurdle it must overcome for the Court to find John Deere in contempt.

Accordingly, the undersigned recommends as follows:

That John Deere's Motion to Vacate the Court's November 5, 2014 Order Sealing the Case (DN 46) be GRANTED.

That Rudd's Motion to Hold John Deere in Contempt of Court (DN 48) be DENIED.

If either party objects to this Report and Recommendation, this case shall remain under seal until such time as the District Court has ruled on the objections.  If neither party objects, the case shall be unsealed in 30 days.

All other motions are moot.

cc:  Counsel of record


## Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.  A copy shall forthwith be electronically transmitted or mailed to all parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, any party may serve and file specific written objections to these findings and recommendations.  *Id.*; Fed. R. Civ. P. 72(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy of the objections.  Fed. R. Civ. P. 72(b)(2).